IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DENISE S. HAROLD,<br>    Plaintiff,<br><br>v.<br><br>JOANNE BARNHART,<br>Commissioner of the<br>Social Security Administration,<br>    Defendant. | :<br>:<br>:<br>:   Civil Action No. 05-5841<br>:<br>:<br>:<br>:<br>: |

**MEMORANDUM AND ORDER**

Anita B. Brody, J.                                                                                   August   17 , 2006

      Plaintiff is a former employee of the Social Security Administration ("SSA" or "the agency"). She sues the Commissioner of the Social Security Administration seeking review of her termination from the SSA's Office of General Counsel, Region III, in Philadelphia, PA.[1] Plaintiff claims that she is entitled to equitable, declaratory and injunctive relief because defendant's actions during the termination process violated her rights under the Self-Incrimination and Due Process Clauses of the Fifth Amendment[2]; because the agency lacked

---

[1] Although plaintiff must name the Commissioner of the SSA as defendant, the real target of this suit is the Merit Systems Protection Board, who affirmed the SSA's decision to terminate plaintiff. The Merit Systems Protection Board ("MSPB") is an administrative body created by the Civil Service Reform Act of 1978, 5 U.S.C. § 1201 *et seq.*, to adjudicate appeals by federal employees. Most appeals from decisions of the MSPB must be brought before the Federal Circuit, pursuant to 5 U.S.C. § 7703(b). However, so-called "mixed" cases, in which a federal employee seeks review of both discrimination and non-discrimination claims, must be brought in the proper district court. Kean v. Stone, 926 F.2d 276, 282-87 (3d Cir. 1991). For an explanation and history of the bifurcation of appeals from decisions of the Merit Systems Protection Board, see Kean, id. at 282-85.

[2] The complaint appears to assert the Fifth Amendment claims as independent claims for relief, rather than seeking review of the MSPB's rejection of those claims. Plaintiff does not specify the cause of action under which her Fifth Amendment claims arise, and defendant does not raise any objection on this basis. I note that a cause of action is provided by Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971). "A Bivens action, which is

1

substantial evidence to support its decision to fire her; and because her termination was racially motivated, in violation of Title VII of the Civil Rights Act. Jurisdiction is proper under 28 U.S.C. § 1331 and 5 U.S.C. § 7703(b)(2).

Before me are defendant's original and renewed motions to dismiss plaintiff's Fifth Amendment and Title VII claims and for summary judgment on plaintiff's dismissal on the basis of the administrative record. Plaintiff has opposed defendant's motion and cross moves for summary judgment on all claims except for that brought under Title VII. For the reasons stated below, I will deny plaintiff's motion and will grant in part and deny in part defendant's motions.

**I.     Background**[3]

Plaintiff is an African American female who was employed during the relevant period as a Grade Twelve Information Technology Computer Specialist at the SSA's Office of General Counsel, Region III, in Philadelphia, PA.

On October 28, 2003, Johann Sharp ("Sharp"), an office-mate of plaintiff, reported to Sharp's supervisor, Eric Kressman, that plaintiff had falsely signed that day's Time and Attendance Roster ("timesheet") for another co-worker, Edwinter Pace ("Pace"). Thomas Petro ("Agent Petro"), a Special Agent of the SSA Office of the Inspector General ("OIG"), proceeded to investigate Sharp's report.

---

the federal equivalent of the § 1983 cause of action against state actors, will lie where the defendant has violated the plaintiff's rights under color of federal law." Brown v. Philip Morris, Inc., 250 F.3d 789, 800 (3d Cir. 2001). As plaintiff seeks only declaratory and injunctive relief for the asserted Fifth Amendment violations (see Compl. at 31-32), the matter is not precluded by the Civil Service Reform Act, and I have jurisdiction over her claims. See Mitchum v. Hurt, 73 F.3d 30 (3d Cir. 1995); cf. Sarullo v. U.S. Postal Serv., 352 F.3d 789 (3d Cir. 2003).

[3] The following facts are undisputed except where otherwise indicated.

On March 10, 2004, plaintiff met with Agent Petro for approximately two hours to provide handwriting exemplars for the investigation. Agent Petro asked plaintiff three times to write in cursive. Plaintiff refused and continued to print, explaining that cursive was not her customary mode of writing. A representative from plaintiff's union, the American Federation of Government Employees ("AFGE") Local 2006, objected to the agent's request that plaintiff write in cursive. Plaintiff alleges that Agent Petro subsequently told her to write the way she normally wrote. On that date, plaintiff also gave a written statement averring that she had not signed the timesheet for Pace on October 28, 2003.

Shortly after meeting with plaintiff, Agent Petro spoke to Patricia Smith ("Smith"), Deputy Regional Chief Counsel for the SSA. Agent Petro informed her that the results of the handwriting analysis were likely to be "undetermined"[4] because he did not obtain enough cursive samples. In September 2004, Smith called plaintiff and plaintiff's union representative to a meeting in her office. Smith told plaintiff that Agent Petro had informed her that plaintiff had failed to cooperate in the handwriting analysis.

On December 18, 2003, Smith proposed the removal of Pace, the co-worker for whom plaintiff allegedly signed in on October 28, 2003. The proposal was enacted. Pursuant to 5 U.S.C. § 7701, Pace appealed the termination decision to the Merit Systems Protection Board ("MSPB"), the administrative body charged with hearing federal employee appeals. On July 16, 2004, plaintiff testified on Pace's behalf at a hearing before an Administrative Judge ("AJ") of the MSPB ("the Pace hearing"). Plaintiff testified that she did not sign Pace's name or write

---

[4] At plaintiff's hearing, Agent Petro did not fully explain the meaning of "undetermined." He testified that there are nine possible classifications for the result of a handwriting analysis, including "inconclusive" and "undetermined." (A.R., Hearing Tr. at 124, lns. 21-25.) From context, it appears that "undetermined" signifies that no finding was made that handwriting samples affirmatively matched, but no finding was made that they definitively failed to match, either.

"6:00 a.m." next to Pace's name on the October 28, 2003 timesheet. The AJ ultimately upheld Pace's removal, finding that Pace was not present at work at the time the timesheet indicated, and that someone else had signed her in. (A.R., Vol. 1 at 335-36.) The AJ made no specific finding as to who had signed in for Pace. (Id.)

On March 11, 2004, plaintiff approached two co-workers who had participated in the investigation, Maria Mengel and Tammy Mouzon. Plaintiff told these two co-workers that she was no longer their friend because of what they had told the OIG during the investigation. Defendant alleges that plaintiff was yelling and acting intimidating; plaintiff maintains that she spoke to them in a calm, non-threatening manner and that they were the ones to use loud voices. After this encounter, Smith met with plaintiff and notified her that two employees had filed complaints against her, alleging that she had intimidated them for being witnesses in the investigation.

On November 9, 2004, Smith proposed plaintiff's removal for: 1) signing in for Pace on October 28, 2003; 2) refusing to provide cursive handwriting exemplars to Agent Petro; 3) falsely denying guilt during the investigation and at Pace's hearing; and 4) confronting two witnesses regarding statements they gave during Pace's investigation. (A.R., Vol. 1 at 322-26.) On the same date, defendant restricted plaintiff's access to confidential records. On November 12, 2004, plaintiff's duties of a confidential nature were reassigned.

Plaintiff retained Joseph Ponisciak ("Ponisciak"), Executive Vice President of the AFGE Local 2006, to represent her. On November 17, 2004, Ponisciak sent an e-mail to Donna Calvert ("Calvert"), SSA Regional Chief Counsel, requesting copies of "all documents used to support Ms. Smith's proposal [of removal], including all memos and reports, any shredded paper, and any statements." (See A.R., Vol. 2 at 204.) On November 23, 2004, Calvert responded with

4

eleven documents.  Calvert did not tell Ponisciak at this time that on March 10, 2004, Agent Petro had orally informed Smith that the handwriting analysis was likely to be "undetermined."  On December 2, 2004, Calvert provided Ponisciak a copy of a declaration by Agent Petro stating that at their meeting on March 10, 2004, Agent Petro asked plaintiff to write in cursive three times, but plaintiff nonetheless continued to print, giving the explanation that plaintiff does not write in cursive.  (A.R., Vol. 1 at 319-20.)

On December 1, 2004, Ponisciak responded on plaintiff's behalf to the proposed removal, denying the SSA's allegations and arguing that it lacked sufficient evidence.  Ponisciak noted that the result of the handwriting analysis "couldn't determine who wrote the [timesheet] entries" and argued that this weighed in plaintiff's favor.  (A.R., Vol. 1 at 312.)

On January 5, 2005, the SSA offered plaintiff a "Last Chance Agreement" ("LCA") that provided for plaintiff to remain at the SSA in a lower-grade position and with a long-term suspension, in exchange for plaintiff acknowledging the charged misconduct and waiving her right to appeal.  (See A.R., Vol. 2 at 100.)  Plaintiff was told that if she did not accept the LCA, she would be terminated in two days.  Plaintiff was not asked to sign a waiver of her Fifth Amendment rights.  The LCA was silent on whether plaintiff's acknowledgment of the charged misconduct could be used against her in a later criminal proceeding.

Plaintiff refused the LCA and was officially terminated by Calvert in a memorandum dated January 7, 2005.  Plaintiff appealed to the MSPB, challenging the sufficiency of the evidence and asserting affirmative defenses of retaliation, violations of the Due Process and Self-Incrimination Clauses, and race discrimination.  On May 2, 2005, after a period for discovery, a single AJ for the MSPB heard plaintiff's appeal.  He upheld the termination.

Plaintiff appealed to the full panel of the MSPB. The full panel affirmed and adopted the AJ's decision on October 4, 2005.

To date, plaintiff has not faced a criminal investigation or charges based upon the misconduct alleged by the agency.

Plaintiff filed this suit on November 7, 2005. On January 27, 2006, defendant filed a motion for summary judgment to uphold the MSPB's termination decision and a motion to dismiss plaintiff's constitutional and race discrimination claims for failure to state a claim. Plaintiff responded by filing an amended complaint. Defendant renewed her motion to dismiss and for summary judgment in relation to the amended complaint on March 13, 2006. On March 28, 2006, plaintiff opposed defendant's motion on all claims and filed a cross-motion for summary judgment as to all of her claims except for her claim of race discrimination (upon which she merely seeks to proceed to discovery). No discovery has taken place.

**II.     Standard of Review and Legal Standard**

Under 5 U.S.C. § 7703(c), judicial review of a termination decision by the MSPB is limited to review of the administrative record. Such decisions must be affirmed unless they are "arbitrary, capricious, not in accordance with law, obtained without procedures required by rule, law, or regulation, or unsupported by substantial evidence." 5 U.S.C. § 7703(c). See also Buchanan v. Dep't of Energy, 247 F.3d 1333 (Fed. Cir. 2001). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005). It is more than a "mere scintilla" but may be somewhat less than a preponderance of the evidence. Id. The substantial evidence standard is extremely deferential to the factfinder. Metro. Stevedore Co. v. Rambo, 521 U.S.

121, 149 (1997).  In determining whether substantial evidence supports an agency's decision, a court examines the administrative record as a whole.  McCrea v. Comm'r of Soc. Sec., 370 F.3d 357, 360-61 (3d Cir. 2004).  On questions of law, judicial review is plenary.  Armstrong v. Commodity Futures Trading Comm'n, 12 F.3d 401, 403 (3d Cir. 1993).

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a court may dismiss a complaint for failure to state a claim upon which relief can be granted.  The purpose of a Rule 12(b)(6) motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case.  Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993).  A Rule 12(b)(6) motion to dismiss should be granted "only if, 'accepting as true the facts alleged and all reasonable inferences that can be drawn therefrom' there is no reasonable reading upon which the plaintiff may be entitled to relief."  Vallies v. Sky Bank, 432 F.3d 493, 494 (3d Cir. 2006) (citations omitted).

**III.   Discussion**

At her appeal before the MSPB, plaintiff sought to void her termination on several grounds, which she renews here.  Her claims may be organized into four classes: 1) lack of substantial evidence to support the MSPB's affirmance of the SSA's final decision to terminate plaintiff; 2) constitutional violations committed by defendant during the termination process; 3) application of the doctrines of collateral estoppel and/or *res judicata*; and 4) race discrimination.  As I explain below, summary judgment for the defendant is warranted as to plaintiff's substantial evidence claims.  Her constitutional and collateral estoppel and/or *res judicata* claims will be dismissed for failing to state a claim upon which relief may be granted.  Her claim of race discrimination under Title VII will proceed to discovery.

### A. Substantial evidence review of the MSPB decision (Counts IV and V)

Plaintiff argues that the AJ lacked substantial evidence to justify his affirmance of her removal by the SSA. On the contrary, the administrative record supports the AJ's decision.[5]

> 1. *Substantial evidence supports the MSPB's finding that plaintiff engaged in conduct unbecoming a federal employee.*

The agency's proposal to remove plaintiff cited four "specifications," or charges of misconduct: 1) signing in for Pace on October 28, 2003; 2) failing to provide the handwriting exemplars requested by Agent Petro on March 10, 2004; 3) falsely denying that she had signed in for Pace in a signed statement on March 10, 2004 and at Pace's MSPB hearing on July 16, 2004; and 4) on March 11, 2004, confronting two witnesses, Tammy Mouzon and Maria Mengel, about their participation in the internal investigation of the Pace incident. Substantial evidence supports each of these charges.

          a. Plaintiff signed in for Pace on October 28, 2003.

The AJ found that sufficient circumstantial evidence existed to establish that plaintiff signed in for Pace. Considering the administrative record as a whole, substantial evidence supports his conclusion.

First, the testimony of plaintiff's co-worker Johann Sharp ("Sharp") supports the AJ's findings. The AJ found Sharp's testimony "unbiased and extremely credible." (A.R., Vol. 2 at 7.) Such credibility determinations are "virtually unreviewable." Hambsch v. Dep't of Treasury, 796 F.2d 430, 436 (Fed. Cir. 1986). Sharp testified that on October 28, 2006, she arrived at work at 6:00 a.m. (Id. at 8.) As she was turning into her cubicle, she had an unobstructed view of plaintiff standing at the sign-in desk and writing something on the timesheet. (Id. at 10-12.) Plaintiff did not normally sign in at that location. (Id. at 11.) Sharp went back to the sign-in desk shortly afterwards and saw Pace's name on the timesheet, signed in at 6:00 a.m. (Id. at 14-15.) Sharp testified that Pace was nowhere to be seen and did not appear at her cubicle (which was close to Sharp's) until approximately 6:20 a.m. (Id. at 16.) Thus, Sharp's testimony established that Pace was signed in at 6:00 a.m. even though she was not yet present, and that plaintiff was present at the sign-in sheet during the period in which Pace's name was likely signed in.[6]

---

[5] As the full panel of the MSPB approved and adopted the AJ's decision, I will review the AJ's decision as the final decision of the MSPB.

[6] Plaintiff makes two arguments for disregarding Sharp's testimony. Both are without merit.

Plaintiff's first argument is that Sharp's testimony is not "dependable" because the AJ in the hearing in the Pace hearing "determined that the Sharp testimony was not credible and probative to establish that Ms. Harold signed Ms. Pace's name." (Pl.'s Cross-Mot. Summ. J. at 36.) First of all, a different AJ's determination of Sharp's credibility in a different hearing on a different matter is irrelevant to whether this AJ's determination of Sharp's credibility in plaintiff's hearing should be upheld. Secondly, even if the other AJ's finding were relevant, plaintiff greatly mischaracterizes that finding. The AJ in the Pace hearing made no adverse credibility finding as to Sharp. While the AJ in the Pace hearing noted the absence of any "direct evidence via an eyewitness to…another employee signing [Pace's] name," the AJ

The AJ also relied on the testimony of Sharp's supervisor, Eric Kressman ("Kressman"). Plaintiff makes no claim that Kressman's testimony was incredible or unreliable. According to Kressman, Sharp notified him on October 28, 2003 that she believed someone was signing in for Pace. Kressman then reviewed the timesheets and noted that Pace's sign-in signature did not look like her "normal and customary signature." (A.R., Hearing Tr. at 51-52.) Specifically, her sign-in signature looked as if "someone had written over it," and the first letters of Pace's first and last name looked different than usual. (Id. at 53.) Kressman was familiar with Pace's signature from previously supervising Pace for a year and a half. (Id. at 53.) He further described his review of the security videotapes for all entrances to the building on that date, in which Pace was not seen entering the building until 6:18 a.m. (Id. at 60-64.) Thus, Kressman's unimpeached testimony corroborated Sharp's testimony that Pace was not present at the time she was signed in on October 28, 2003.

In sum, the testimony of these two witnesses as supported by the documentary and photographic evidence in the record provides substantial evidence for the AJ's conclusion that plaintiff signed in for Pace on October 28, 2003.

> b. Plaintiff failed to provide handwriting exemplars requested by Agent Petro on March 10, 2004.

Ample evidence in the record supports the charge that plaintiff failed to provide the handwriting exemplars requested by Agent Petro on March 10, 2004. At plaintiff's hearing, Agent Petro testified that he asked plaintiff three times to write in cursive, but that plaintiff refused, responding that she usually didn't write in cursive. (A.R., Hearing Tr. at 109, lns. 20-25.) In plaintiff's own testimony, she admitted that this was true. (A.R., Hearing Tr. at 277, ln. 18-278, ln. 13.) The AJ noted that "there is no evidence that [plaintiff] was incapable of writing in cursive," and that in fact, plaintiff testified that "when she went back to her desk after meeting with [Agent] Petro, she practiced signing names in cursive on a piece of paper." (A.R., Vol. 2 at 8; Hearing Tr. at 278, ln. 20-279, ln. 20.) Based on the above evidence, the AJ found that plaintiff had failed to provide the handwriting exemplars requested by Agent Petro.

Given that plaintiff does not contest the credibility of any of this evidence,[7] including her own testimony, the AJ's finding is plainly supported by substantial evidence.

---

nonetheless held that Sharp's testimony was "credible and probative of the fact that [Pace] was not at work at 6:00 a.m. as indicated by the sign-in sheets" (A.R., Vol. 1 at 335), and that Sharp's testimony was "probative and entitled to substantial weight, that the signatures on the sign-in sheets were not placed there by [Pace]." (Id.) In short, the AJ in the Pace hearing expressed no doubts about Sharp's credibility.

Plaintiff's second argument is that Sharp's account was "contrary to physical laws." (Pl.'s Cross-Mot. Summ. J. at 39.) The photographic evidence in the record of the office layout (see A.R., Vol. 2 at 85-91) sufficiently supports Sharp's testimony (A.R., Vol. 2 at 7-50), such that a reasonable mind could find her testimony plausible.

[7] Instead, plaintiff argues that her reason for refusing to comply (i.e., that printing was the way she normally wrote) was valid and should have excused her failure to comply. However, I may not substitute my personal judgment of her moral culpability for that of the SSA or the MSPB. As the AJ's rejection of plaintiff's excuse is supported by substantial evidence in the record, it will be upheld.

9

     c. Plaintiff falsely denied that she had signed in for Pace, in a signed statement on March 10, 2004 and at Pace's MSPB hearing on July 16, 2004.

  Plaintiff denied on two occasions that she had signed in for Pace: in a written statement she gave to Agent Petro on March 10, 2004, and in her testimony at the Pace hearing on July 16, 2004.  Logically, the same body of evidence showing that plaintiff did sign in for Pace (see *supra*) proves that plaintiff's denials to the contrary were false.  As substantial evidence supported the underlying finding that plaintiff signed in for Pace, the AJ's finding that plaintiff subsequently testified falsely about it must also be affirmed.

     d. Plaintiff confronted Tammy Mouzon and Maria Mengel on March 11, 2004 and challenged their statements to the agency's investigators.

  The AJ found that it was largely undisputed that plaintiff confronted Tammy Mouzon ("Mouzon") and Maria Mengel ("Mengel") on March 11, 2004, to challenge them about the statements they gave during the internal investigation of the Pace sign-in incident.  As the AJ noted, while plaintiff painted a slightly different picture of her encounter with Mouzon and Mengel, all three agreed on the primary facts – namely, that plaintiff spoke with both women on March 11, 2004, and expressed her displeasure with the statements they had provided to the agency's investigators.  (See A.R., Vol. 2 at 10-11; Hearing Tr. at 74-77, 92-94, 254-61.)

  As the AJ correctly concluded, these undisputed facts were sufficient to establish the charged misconduct.  Plaintiff was charged with confronting internal investigation witnesses and challenging them about their participation.  Her own admission of this conduct is sufficient to support the charge.  As the AJ noted, it is irrelevant whether, as plaintiff argues, she lacked any intent to intimidate or threaten Mouzon and Mengel; the agency did not charge plaintiff with acting with such intent.  Therefore, given that plaintiff's own testimony admits the alleged misconduct, the AJ's finding will be affirmed as supported by substantial evidence.[8]

  In sum, each of the AJ's findings of misconduct were supported by substantial evidence.  Therefore, the AJ's overall finding that plaintiff engaged in conduct unbecoming a federal employee will be affirmed.

    2. *Substantial evidence supports the MSPB's finding that plaintiff's removal was not in retaliation for her testimony in the Pace hearing.*

  The AJ rejected plaintiff's claim that the agency fired her in retaliation for participating in the Pace removal hearing.  To establish a *prima facie* case of retaliation under the Civil

---

[8] Plaintiff argues that, despite her admission, this charge was not a valid basis for her removal because her "withdrawal of personal friendship [from Mouzon and Mengel] does not impact on the efficiency of the service." (Pl.'s Cross-Mot. Summ. J. at 39.)  Plaintiff cites nothing to support the notion that I have any authority under my deferential standard of review to second-guess the agency's determination that this conduct impacts on the efficiency of the service.  Even if I had such authority, plaintiff significantly mischaracterizes the nature of the charge against her.  She was not charged with withdrawing her personal friendship from co-workers, but with confronting witnesses about their participation in an on-going investigation of internal misconduct.  While the former arguably may not impact the "efficiency of the service," the latter surely does.

Service Reform Act, 5 U.S.C. § 2302(b)(9), an employee must show that: 1) she engaged in protected activity; 2) the accused official knew of the protected activity; 3) the official took an adverse employment action that could, under the circumstances, have been retaliation; and 4) there was a genuine nexus between the retaliation and the adverse employment action. Warren v. Dep't of Army, 804 F.2d 654, 656-58 (Fed. Cir. 1986).

The AJ found that plaintiff failed to establish the fourth element of the Warren test: a genuine nexus between her participation in the Pace hearing and her termination. In making this finding, the AJ relied primarily upon the testimony of deciding official Calvert. Calvert testified that "one of the grounds of the proposal [for plaintiff's removal] is providing false testimony, and that's a very serious thing to do….[M]y taking action as a result of that is in accordance with my own ethical obligation and not retaliation." (A.R., Hearing Tr. at 166, lns. 6-11.) The AJ expressly found Calvert credible on this point. (A.R., Vol. 2 at 13.) He noted that plaintiff did not allege that she "had any particular problems with either Ms. Smith [the official who proposed plaintiff's removal] or Ms. Calvert." (Id. at 14.) Thus, "based on [Calvert's] testimony and demeanor," the AJ "discerned no motive on her part to retaliate against [plaintiff]." (Id. at 13.)

Plaintiff argues that the timeline of events leading to her termination is sufficient to overturn the AJ's decision.[9] She is incorrect. The timeline cited by plaintiff is as follows: eight days before plaintiff testified in the Pace hearing, Calvert had not decided whether or not she would fire plaintiff[10]; six weeks after plaintiff testified, Smith met with plaintiff and informed her that she had not sufficiently cooperated with Agent Petro; and finally, three and a half months after the Pace hearing, Smith proposed plaintiff's removal. Plaintiff argues that this timeline of events supports the inference that that plaintiff's participation at the Pace hearing was the trigger and cause of the agency's decision to fire her.

While the above timeline of events may support a reasonable inference of retaliation, a reasonable inference is insufficient at this stage. To defeat defendant's summary judgment motion, plaintiff must do more than merely state a claim – she must establish that, viewing the

---

[9] Plaintiff also argues that the agency's retaliatory motive is evidenced by the fact that the agency cited to plaintiff's false testimony at the Pace hearing as a basis for her removal, and that the agency offered to retain plaintiff if she admitted to having given false testimony. Plaintiff's argument is difficult to understand. If plaintiff is arguing that it is unlawful to terminate an employee for giving false testimony at a prior proceeding, this argument is plainly without merit. While being terminated merely for testifying at a co-worker's MSPB hearing would be retaliation under 5 U.S.C. § 2302(b)(9), being terminated for *falsely* testifying at a co-worker's hearing is an entirely different matter.

It may be that plaintiff's real argument is that the agency's accusation of perjury was false. If so, I address this argument *supra* in my review of the AJ's finding that plaintiff engaged in conduct unbecoming a federal employee.

[10] Plaintiff's evidence on this point consists of a July 8, 2004 email by Calvert to two other management officials, stating that Calvert wished to wait to obtain a statement from Agent Petro about plaintiff's failure to provide cursive handwriting exemplars "until we decide how to proceed." (A.R., Vol. 2 at 189.) Although this statement is vague, viewing the evidence in the light most favorable to plaintiff, it can reasonably be read to indicate that as of July 8, 2004, Calvert had not yet decided to terminate plaintiff.

administrative record as a whole, the AJ's ruling was not supported by substantial evidence. See 5 U.S.C. § 7703(c). The timeline of events cited by plaintiff fails to directly rebut Calvert's testimony that no retaliatory motive played a part in plaintiff's termination. The AJ expressly gave credence to this testimony, and such credibility determinations are "virtually unreviewable." Hambsch, 796 F.2d at 436. Plaintiff gives no reason to reverse this credibility determination.[11] Calvert's testimony therefore stands unimpeached, and is certainly evidence that a reasonable mind might accept as adequate to support a conclusion. See Rutherford, 399 F.3d at 552. Therefore, the AJ's finding that plaintiff was not fired in retaliation for her testimony at the Pace hearing will be affirmed.

### B. Constitutional claims (Counts I and II)

Plaintiff claims that her termination violated the Fifth Amendment's Self-Incrimination and Due Process Clauses.[12] It is a question of law whether plaintiff has stated claims upon which relief may be granted under the Fifth Amendment, and therefore my review is plenary. Armstrong, 12 F.3d at 403. Even taking plaintiff's allegations as true and viewing the facts in the light most favorable to her, plaintiff fails to state viable claims under the Fifth Amendment.

       1. *Plaintiff fails to state a valid self-incrimination claim.*

Plaintiff claims that the agency's offer of the Last Chance Agreement ("LCA") violated the Self-Incrimination Clause of the Fifth Amendment. Specifically, plaintiff argues that defendant infringed upon her right against self-incrimination by forcing her to choose between losing her job (i.e., allowing her proposed removal to go into effect) or admitting to potentially criminal misconduct[13] without any guarantee of immunity from future criminal prosecution. In

---

[11] Plaintiff does not address Calvert's testimony on this issue. Instead, plaintiff challenges the credibility of witness Johann Sharp (see Pl.'s Cross-Mot. at 36). But Sharp did not testify on the issue of retaliation, and the AJ did not mention Sharp's testimony in ruling on plaintiff's retaliation claim. I therefore decline to consider plaintiff's arguments regarding Sharp here, and instead consider them *supra* under my review of the AJ's finding that plaintiff engaged in conduct unbecoming a federal employee, where Sharp's testimony is relevant.

[12] As noted *supra,* plaintiff seems to assert her Fifth Amendment claims as independent claims for relief, rather than seeking review of the MSPB's denial of these claims. Plaintiff's cause of action for declaratory and injunctive relief is provided by Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971). "A Bivens action, which is the federal equivalent of the § 1983 cause of action against state actors, will lie where the defendant has violated the plaintiff's rights under color of federal law." Brown v. Philip Morris, Inc., 250 F.3d 789, 800 (3d Cir. 2001).

[13] Defendant does not contest that the alleged misconduct was potentially criminal. Plaintiff's alleged misconduct potentially violated a number of federal criminal statutes, including: 18 U.S.C. § 1001 (making false writings or documents); 18 U.S.C. § 371 (conspiracy to defraud the United States); 18 U.S.C. §§ 1512, 1513 (witness tampering and retaliation); and 18 U.S.C. § 1521 (perjury).

support of her legal theory, plaintiff points to a line of Supreme Court cases addressing the application of the Self-Incrimination Clause to public employees: Gardner v. Broderick, 392 U.S. 273 (1968), Uniformed Sanitation Men Association v. Commissioner of Sanitation, 392 U.S. 280 (1968), and Lefkowitz v. Turley, 414 U.S. 70 (1973).[14]  These cases differ materially from plaintiff's case, however, and thus fail to provide a basis for plaintiff's claim.

The facts of Gardner, Uniformed Sanitation Men, and Lefkowitz are all substantially similar.  In each case, public employees[15] were called to testify before a grand jury charged with investigating alleged misconduct by the employees' departments.  In Gardner, police officers were being investigated for alleged bribery and corruption; in Uniformed Sanitation Men, municipal sanitation workers were being investigated for not charging proper fees and for unlawful diversion of funds; and in Lefkowitz, government contractor architects were being investigated for bribery and larceny.  In each case, the state asked the public employees to waive their immunity from any future criminal prosecution arising from their statements to the grand jury.[16]  The state told the public employees that if they refused to waive immunity, they would be fired and disqualified from future public employment.  A state charter or statute operated in each case to mandate the firing and disqualification of public employees who refused to waive immunity before a grand jury.  Thus, when the employees in Gardner, Uniformed Sanitation Men, and Lefkowitz refused to waive immunity, they were duly fired.  The Supreme Court held that in these cases, the state had violated the Self-Incrimination Clause by forcing the public employees to choose between "surrendering their constitutional rights or their jobs."  Uniformed Sanitation Men, 392 U.S. at 284.

Plaintiff seeks to cast her case in the same light as these three cases.  However, plaintiff's case falls far outside their ambit.  In Gardner, Uniformed Sanitation Men, and Lefkowitz, the state fired the public employee plaintiffs solely and expressly because they had refused to waive their right to immunity from future criminal prosecution.  Under the statutes that were then in force, no other basis was needed to terminate them.  Therefore, the termination actions were unlawful as direct penalties on the public employees' exercise of their Fifth Amendment rights.

Here, in contrast, the complaint admits that the agency proposed plaintiff's removal after finding that she had falsely signed in for a co-worker.  (See Am. Compl. ¶¶ 21-25, 86-87.)  In other words, plaintiff's removal was proposed for cause, not because of or subsequent to her assertion of a Fifth Amendment right.  Whether the agency was ultimately right or wrong about the sign-in incident is irrelevant.  It is undisputed that no Fifth Amendment activity by plaintiff preceded the agency's initiation of termination proceedings.

---

[14] The Gardner line of cases are still good law, as recently affirmed in Chavez v. Martinez, 538 U.S. 760 (2003).  See Chavez, 538 U.S. at 769 n. 2 (2003) (Thomas, J., plurality op.); id. at 778 (Souter, J., concurring).

[15] Lefkowitz held that the Fifth Amendment rights of government contractors did not materially differ from the public employees in Gardner and Uniformed Sanitation Men.  For ease of reference, I will refer to the Gardner line of cases as concerning "public employees," by which I intend to include government contractors.

[16] Incriminating testimony may be compelled in a non-criminal context, so long as the statements made and any evidence derived therefrom are not used against the speaker in a subsequent criminal proceeding.  Kastigar v. U.S., 406 U.S. 441, 443 (1972).

Plaintiff seemingly asks that I ignore the initial proposal of removal and only consider the fact that the proposed removal was put into effect after plaintiff rejected the LCA. This I cannot do. While I must take the allegations in the complaint as true and make all reasonable inferences in plaintiff's favor at this stage, Vallies, 432 F.3d at 494, I may not close my eyes to the whole picture of events simply because that would be more favorable to her. "'[C]ourts have an obligation in matters before them to view the complaint as a whole and to base rulings not upon the presence of mere words but, rather, upon the presence of a factual situation which is or is not justiciable. We do draw on the allegations of the complaint, but in a realistic, rather than a slavish, manner.'" Doug Grant, Inc. v. Greate Bay Casino Corp., 232 F.3d 173, 184 (3d Cir. 2000) (citing City of Pittsburgh v. West Penn Power Co., 147 F.3d 256, 263 n. 13 (3d Cir. 1998)). Therefore, given that plaintiff did not assert her self-incrimination privilege until after the agency had already found cause to remove and had proposed her removal, there is simply no basis to conclude that plaintiff's removal was a penalty for her assertion of a Fifth Amendment privilege.

In the end, any application of the self-incrimination privilege in a civil context must be somehow necessary or advisable to safeguard the Fifth Amendment's core guarantee. See Chavez v. Martinez, 538 U.S. 760, 778 (2003) (Souter, J., concurring). To allow for civil liability against the defendant under facts such as these would be to expand the scope of the self-incrimination privilege beyond recognition. The Self-Incrimination Clause's fundamental concern is to protect individuals from being compelled by the state to incriminate themselves in criminal matters. See Chavez, 538 U.S. at 769 (plurality op.); id. at 777 (Souter, J., concurring). Plaintiff has failed to show that this fundamental concern was imperiled in her case. Therefore, plaintiff has failed to state a valid claim under the Self-Incrimination Clause.

*Plaintiff fails to state a valid due process claim.[17]*

Plaintiff claims that the SSA's conduct during the investigation and termination process violated her right to due process under the Fifth Amendment. As plaintiff's allegations fail to state a claim, this claim will also be dismissed.

Defendant does not dispute that plaintiff had a protected interest in her continued employment. In order to trigger the protections of the Fifth Amendment's Due Process Clause, a plaintiff must have been deprived of a protected interest in life, liberty, or property. Mathews v. Eldridge, 424 U.S. 319, 332 (1976). The Civil Service Reform Act of 1978 entitles federal civil service employees, such as plaintiff, to remain employed in their positions unless and until the agency demonstrates "such cause [for removal] as will promote the efficiency of the service." 5 U.S.C. § 7513(a). Thus, the Act confers upon federal civil service employees a legitimate entitlement in continued employment, so as to trigger the Fifth Amendment's due process protections when they are terminated. See Stone v. Fed. Deposit Ins. Corp., 179 F.3d 1368, 1375 (Fed. Cir. 1999); cf. Board of Regents of State Colleges v. Roth, 408 U.S. 564, 577 (1972) and Chabal v. Reagan, 841 F.2d 1216 (3d Cir. 1988).

In the public employment context, "due process" requires that the government employer provide: 1) oral or written notice of the charges against the employee, 2) an explanation of the employer's evidence, and 3) an opportunity for the employee to present his or her side of the story before his or her job is terminated. Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 546 (1985) (citation omitted).

---

[17] Although plaintiff fails to designate this as a procedural due process claim, all the cases she cites and the arguments she makes employ the procedural due process analysis.

It is the second element, the explanation of the employer's evidence, that plaintiff claims was compromised in her case. Plaintiff argues that two pieces of "*ex parte* evidence" were turned over to her in an impermissibly tardy fashion: 1) Agent Petro's oral report to Smith on March 10, 2004, that the results of plaintiff's handwriting analysis were likely to be "undetermined"; and 2) the May 19, 2004 handwriting analysis report declaring the result "undetermined." Plaintiff argues that these two pieces of evidence introduced new and material information to the deciding officials, such that without timely access to them, she was unable to fully respond to the charges against her.

Plaintiff fails to state a valid due process claim because the cited communications were not *ex parte*. By definition, an *ex parte* communication does not take place until an adjudicative proceeding has commenced and there are opposing parties. In the employment context, for example, an *ex parte* communication would include an undisclosed communication between management officials about an employee who has been officially charged with misconduct. See, e.g., Stone, 179 F.3d 1368 (Fed. Cir. 1999) (federal employer committed due process violation where, after employee's removal had been proposed, deciding official received two *ex parte* memoranda from other management officials, but did not provide copies to employee until after decision to remove was made). Such communications implicate due process concerns because they prevent an employee from effectively mounting her defense against the charges against her. See id. at 1377-78. Here, in contrast, the communications cited by plaintiff took place during the internal investigation of the Pace incident, several months *before* plaintiff's termination was ever proposed. She had not yet been charged with any misconduct, so she was not yet a party to any termination action. Therefore, no due process right attached to plaintiff at that time, and plaintiff fails to state a valid claim of an *ex parte* violation.[18]

    C.    **Collateral estoppel and/or *res judicata* claim (Count III)**

Plaintiff argues that summary judgment should be entered in her favor because the issue of whether plaintiff signed in for Pace on October 28, 2003 was *res judicata*, or, alternatively, that defendant should be collaterally estopped from raising the issue against plaintiff. Plaintiff's

---

[18] Plaintiff's claim could be reconstrued as a claim that she received insufficient notice of the charges and evidence once her removal was proposed. Even if the issue were notice, however, defendant would be entitled to summary judgment on this claim. (As plaintiff refers to matters in the record in the administrative record, outside the pleadings, defendant's motion could be converted to a motion for summary judgment without prejudice to plaintiff. See In re Rockefeller Ctr. Prop., Inc. Sec. Litig., 184 F.3d 280, 288 (3d Cir. 1999).)

The administrative record unambiguously indicates that plaintiff did have notice of the so-called *ex parte* communications before her removal became final. Plaintiff does not deny receiving a copy of a declaration by Agent Petro (which attested to plaintiff's refusal to write in cursive during their meeting on March 10, 2004) on or about December 2, 2004, over a month before her termination became final. (See A.R., Vol. 1 at 319-20.) As for the result of the handwriting analysis, Ponisciak, plaintiff's union representative, explicitly referred to it in his written response to the SSA's proposal of removal, arguing that the "undetermined" result weighed in plaintiff's favor. (See A.R., Vol. 1 at 312.) It is thus evident that Ponisciak had notice of the results in time to prepare his response. Therefore, even if all reasonable inferences are made in the plaintiff's favor, the record nonetheless reveals that plaintiff did have notice of these two pieces of evidence in time for her to respond.

Given that reconstruing plaintiff's due process claim would be futile, I decline to do so.

theory is that because the government had the opportunity in the Pace matter to prove that plaintiff was the individual who signed in for Pace on October 28, 2003, and the AJ in the Pace hearing failed to make a specific factual finding about who signed in for Pace, the government essentially lost on that issue and should be precluded from raising the issue in its termination action against plaintiff. This argument is without merit.

The doctrine of *res judicata* or claim preclusion does not apply to this case because different parties were involved in the prior proceeding, the Pace hearing.[19] The doctrine of *res judicata* provides that a final decision on the merits of an action precludes the same parties from relitigating issues that were or could have been raised in the prior action. Stearn v. Dep't of Navy, 280 F.3d 1376, 1380 (Fed. Cir. 2002) (citation omitted). Here, the requirement of identical parties is not met. The subject of the dismissal action in the Pace matter was Pace; the subject here was plaintiff. Therefore, the agency is not barred by *res judicata* from litigating the issue of whether plaintiff signed in for Pace.

The doctrine of collateral estoppel or issue preclusion does not apply because identical issues are not present. The MSPB may apply collateral estoppel as a bar where: 1) an issue being litigated is identical to one in a prior action; 2) the issue was actually litigated; 3) the determination of the issue was necessary to the prior judgment; and 4) the party to be precluded was fully represented in the prior action. Morgan v. Dep't of Energy, 424 F.3d 1271, 1274-75 (Fed. Cir. 2005). One of the issues presented and decided in the Pace removal action was whether Pace was present at work at the time she signed in on October 28, 2003. (See A.R., Vol. 1 at 333-36.) The only similar issue presented and decided in plaintiff's removal action, in contrast, was whether plaintiff was the individual responsible for signing in for Pace on October 28, 2003. Plaintiff's personal responsibility was not at issue in the Pace hearing, and the AJ did not opine upon it. Thus, although the two issues arise from the same occurrence or transaction, they are distinct, and thus the application of collateral estoppel is not justified.

**D.     Title VII claim (Count VI)**

Plaintiff alleges that her termination was racially motivated, in violation of Title VII of the Civil Rights Act. The issue of whether plaintiff has stated a valid claim of employment discrimination is a question of law to be reviewed *de novo*. Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003). Because plaintiff's allegations state a valid claim of race discrimination, defendant's motion to dismiss this claim will be denied.

Plaintiff alleges that defendant "is engaged in a pattern or practice of using discipline and the threat of discipline to systematically remove career African-American staff persons or intimidate African-American staff persons into leaving their employment at SSA/OGC-III and

---

[19] There may be some question as to whether the MSPB is required to adhere to the doctrines of collateral estoppel and *res judicata* at all, or in this case. For consideration of the issues involved in such an inquiry, see Duvall v. Attorney General of the United States, 436 F.3d 382 (3d Cir. 2006) ("It is not the prerogative of the federal courts to impose upon administrative agencies procedural doctrines or rules of decision, whatever their historical pedigree") (holding on facts of case that collateral estoppel did not apply to bar the Immigration and Naturalization Service from relitigating petitioner's immigration status). Neither party has briefed this issue. I will therefore follow the approach of the Federal Circuit, which applies the doctrines of collateral estoppel and *res judicata* to MSPB actions. See, e.g., Stearn v. Dep't of Navy, 280 F.3d 1376, 1380-82 (Fed. Cir. 2002); Carson v. Dep't of Energy, 398 F.3d 1369, 13 (Fed. Cir. 2005); Morgan v. Dep't of Energy, 424 F.3d 1271,  (Fed. Cir. 2005).

ultimately to replace them with non-African-Americans." (Compl. ¶ 109.) Plaintiff alleges that she and three other African American employees were replaced by a Caucasian in this manner. (Id.) She further alleges that she was treated less favorably than at least one similarly situated comparator:

> A Caucasian male who worked in the same building as [plaintiff] and Ms. Pace was found to have falsified timesheet entries. In that instance, the Commissioner did not launch an investigation, dismantle hard drives, reconstruct e-mails, request handwriting exemplars and analysis, or remove two 16-year employees. In the case of the Caucasian male, the Commissioner disciplined him with only a counseling memorandum….[T]his Caucasian male was only a probationary employee with access to equally sensitive or more sensitive information than [plaintiff]."

(Compl. ¶ 111.)

Defendant argues that plaintiff's claim must be dismissed for failure to "point to" similarly situated individuals of a different race who were treated more favorably than plaintiff. (Def.'s Reply at 13.) Defendant misstates plaintiff's burden at this stage.[20] The proper role of a complaint is simply to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Conley v. Gibson, 355 U.S. 41 (1957). Under Federal Rule of Civil Procedure 8(a), a plaintiff is only required to provide defendant a "short and plain statement of the claim showing that the pleader is entitled to relief." Nothing in Rule 8(a) requires a plaintiff with an employment discrimination claim to allege specific facts establishing each element of a *prima facie* case under McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).[21] The Supreme Court recently rejected the Second Circuit's application of such a

---

[20] The case cited by defendant, Bullock v. Children's Hospital of Philadelphia, 71 F. Supp. 2d 482, 489-90 (E.D. Pa. 1999) (Reed, J.), is inapposite because it addressed a motion for summary judgment, not a motion to dismiss.

[21] McDonnell Douglas established a three-step burden-shifting framework to govern the order and allocation of proof in employment discrimination cases. See 411 U.S. at 800. The first step is for the plaintiff to establish a *prima facie* case of discrimination, which creates an inference that the employer acted with a discriminatory motive. Id. at 802. At this step, plaintiff must allege that: 1) she is a member of a protected class; 2) she was qualified for the position she sought to obtain or retain; 3) she suffered an adverse employment action; and 4) the action occurred under circumstances that could give rise to an inference of intentional discrimination, such as where a similarly situated person not of the protected class is treated more favorably. Id.; Jones v. Sch. Dist. of Philadelphia, 198 F.3d 403, 410-11 (3d Cir. 1999). If plaintiff passes

heightened pleading requirement for Title VII cases in <u>Swierkiewicz v. Sorema N. A.</u>, 534 U.S. 506 (2002) (reversing lower court's grant of motion to dismiss). As the Court explained, "The prima facie case under <u>McDonnell Douglas</u>…is an evidentiary standard, not a pleading requirement." <u>Id.</u> at 510. To require Title VII allegations to be pled with particularity, the Court reasoned, would "'too narrowly constric[t] the role of the pleadings,'" and thus was not warranted or appropriate. <u>Id.</u> at 511 (citation omitted).

Here, the Amended Complaint gives defendant more than fair notice of the basis for plaintiff's claims. Plaintiff alleges that her termination was motivated by racial animus, as supported by the allegation that at least one non-African American employee who committed similar misconduct was treated more favorably. This is a cognizable claim under Title VII.[22] Plaintiff's allegations thus give defendant notice of the nature of her discrimination claim, its factual basis, and even of some of the evidence she plans to use in support. She need not do more. Therefore, defendant's motion to dismiss plaintiff's Title VII claim will be denied.

**IV.    Conclusion**

---

this step, the burden then shifts to the defendant to articulate some legitimate business reason for the adverse employment action. <u>Id.</u> at 802-03. If the defendant meets this burden, the inference of discriminatory motive is dispelled and the burden shifts back to the plaintiff to show that the defendant's articulated reason is merely a pretext for intentional discrimination. <u>Id.</u> at 803.

[22] This claim is valid under Title VII even given my holding that substantial evidence supports the agency's finding that plaintiff committed the alleged misconduct. Even a plaintiff who admits to committing misconduct may validly claim a violation under Title VII if others of a different race who committed similar misconduct are treated more favorably. <u>See</u> <u>McDonald v. Santa Fe Trail Transp. Co.</u>, 427 U.S. 273 (1976) (reversing lower court's order granting motion to dismiss because valid Title VII claim existed where Caucasian plaintiffs were fired for misappropriating property from their employer, but another employee of a different race who committed the same misconduct was not). "The [Civil Rights] Act prohibits all racial discrimination in employment, without exception for any group of particular employees, and while crime or other misconduct may be a legitimate basis for discharge, it is hardly one for discrimination." <u>Id.</u> at 283.

Defendant's decision to terminate plaintiff's employment was supported by substantial evidence. Plaintiff fails to state a valid self-incrimination or due process violation under the Fifth Amendment. Collateral estoppel and/or *res judicata* do not apply to bar defendant's termination of plaintiff. Plaintiff's allegations of race discrimination are sufficient to withstand a motion to dismiss, so that claim will go forward.

## **ORDER**

**AND NOW**, this __17th___ day of August, 2006, upon consideration of defendant's motions to dismiss and for summary judgment (Docs. # 6 and 13), plaintiff's cross-motion for summary judgment (Doc. # 17), and the responses and replies, it is **ORDERED** that the plaintiff's motion (Doc. # 17) is **DENIED**. Defendant's motions (Docs. # 6 and 13) are **GRANTED** in part and **DENIED** in part. They are **GRANTED** as to Counts I-V and **DENIED** as to Count VI.

A scheduling order will follow.

_____
ANITA B. BRODY, J.

Copies **VIA ECF** on _____ to:        Copies **MAILED** on _____ to:

Harold Opinion Motion Dismiss and Summary Judgment.doc